76 F.3d 390
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Rosaura ZAPATA-VIRGIN, Defendant-Appellant.
 No. 95-50043.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 16, 1995.
Decided Jan. 23, 1996.
 
 1
 Before: HALL and NOONAN, Circuit Judges; PRO, District Judge.*
 
 
 2
 MEMORANDUM**
 
 
 3
 Rosaura Zapata-Virgin (Zapata) challenges her convictions of federal drug and other offenses, as well as her sentence. We affirm.
 
 FACTS
 
 4
 On May 5, 1995, at about 2:40 p.m., defendant Zapata drove a 1984 Chevrolet Camaro from Mexico into the United States through the Port of Entry at Otay Mesa, California. Customs Inspector Rita Haskell (CI Haskell) inspected Zapata's resident alien card and asked Zapata why she had traveled to Mexico. Zapata answered that she had been in Mexico since about 10:00 a.m. that morning and had dropped off in Tijuana her aunt, who had visited her and her family in Los Angeles. CI Haskell then asked Zapata for the car registration, but after searching around in the car, Zapata was unable to produce the document. Zapata claimed that she had owned the car for about one year and that she drove the car along with her sister. CI Haskell observed Zapata chewing her gum rapidly, twirling her hair, and avoiding eye contact during their conversation. CI Haskell also noticed that the glove box had been stripped clean. CI Haskell then asked several more questions and inspected the trunk of the car. She could not get the spare-tire well open, so she opened the passenger door, where she found the area to be noticeably clean. During the inspection, Zapata appeared nervous, shifting her weight from foot to foot and her gaze from north to south. CI Haskell grew suspicious, so she had Zapata escorted to the security office and had the car taken for a secondary inspection.
 
 
 5
 During the secondary inspection, a narcotic-detector dog alerted the investigators to the rear trunk area. In the right-fender well, rear-bumper compartment, and back-seat panel areas, 84.3 pounds of marijuana were found. The drugs had been concealed in such a manner that made it impossible to see them simply by looking at the car.
 
 
 6
 Investigators Tatum King and James Sevel later informed Zapata that she was being arrested for drug smuggling because marijuana had been found in the car she was driving. Zapata voluntarily waived her Miranda rights and spoke to the investigators. Zapata denied having any knowledge that the car contained any drugs, and she also claimed that she was the owner of the car. Zapata said that she had purchased the car from an unknown Mexican male on a Los Angeles street, but had not yet registered the car in her name. Zapata continued to maintain that she had visited Mexico to drop off her Aunt Julia in Tijuana. However, when pressed for details by the investigators, Zapata was unable to provide her Aunt Julia's last name, telephone number, or address.
 
 
 7
 After running a computer check, Investigator King found out that the car Zapata was driving had been stolen. In fact, the car had been stolen two months earlier from the U.S. Customs Service after it had been seized pursuant to a drug arrest. When the investigators confronted Zapata with the fact that the car had been stolen, Zapata said, "I've been bullshittin' you, I have nothing to tell you." At that point, the interview ended.
 
 PROCEEDINGS
 
 8
 On May 18, 1994, a federal grand jury indicted Zapata for importation of marijuana in violation of 21 U.S.C. §§ 952 and 960; possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1); and importation of a stolen vehicle in violation of 18 U.S.C. § 553(a)(1).
 
 
 9
 On August 23 and 24, 1994, Zapata was tried before a jury. The defense introduced no evidence after the government's case but instead moved for a judgment of acquittal, which was denied. In closing argument, the prosecution explained the concept of circumstantial evidence to the jury by an example involving a cat in a box:
 
 
 10
 What is circumstantial evidence? A good way to explain it is just by example. You put a little mouse in a box. You put a lid on it. And then you put a cat in the box, put the lid back on, and a few minutes later you take the lid off and only the cat remains. Well, that's circumstantial evidence that the cat ate the mouse. Now, the only one who really knows whether the cat ate the mouse, the only one who knows beyond any doubt is the cat. The cat in this case is the defendant.
 
 
 11
 In his closing, defense counsel attacked the prosecution's circumstantial evidence:
 
 
 12
 I think there were ten [prosecution witnesses] ... Ten witnesses that came into this courtroom. And as we promised you in opening, not one of those witnesses--not one of them could tell you that Rosaura knew there were drugs in that car. No one did. No one could. That's because she didn't know.
 
 
 13
 And the government had a parade of witnesses, and they had--they had exhibits--I was impressed, lots of exhibits. Lots of overlays, well-prepared witnesses, but what did all of that tell you about what she knew of the drugs in the car? Nothing.
 
 
 14
 They didn't meet their burden in this case. They just didn't meet it. And that's why we decided last night not to call any witnesses in this case.
 
 
 15
 Later, in rebuttal, the prosecution responded:
 
 
 16
 Now, there was an argument made that no one can tell you that the defendant put that drug in the car or knew about it. Yes, somebody can tell us. It's the defendant.
 
 
 17
 [Defense counsel:] Objection.
 
 
 18
 The circumstantial evidence shows you. The direct evidence shows you. It's like the cat in the box. She's the cat.
 
 
 19
 The trial judge did not rule on the objection, and the prosecutor completed the rebuttal. The case went to the jury, and after about three hours, the jury returned to render its verdict.
 
 
 20
 Defense counsel, however, requested a sidebar and argued for a mistrial under Griffin v. California, 380 U.S. 609 (1965), on the grounds that the prosecution impermissibly commented on Zapata's failure to testify. The prosecution replied that the defense counsel had "opened the door" to such comment when the defense counsel asserted that no witness could testify that Zapata had knowledge of the marijuana. The district court rejected the government's argument, but declined to declare a mistrial. The court ruled:
 
 
 21
 I caught it, and I immediately looked at the jury. Obviously, I was conscious of that. It was a casual comment. I noted the jury, and they didn't get any reaction out of it at all. Although I think it was there to do it, I think it was not prejudicial.... I think it was, obviously, unintentional, I caught it, and I saw you [defense counsel] start to get up and say something. I decided to best ignore it, instead of calling attention to it with the jury. I looked at them. It was just a passing comment. They didn't pay anything to it.
 
 
 22
 The jury later found Zapata guilty on all three counts.
 
 
 23
 On January 6, 1995, the district court held Zapata's sentencing hearing, at which defense counsel requested a minor role reduction. Defense counsel argued that there was no evidence that Zapata played any role in drug trafficking other than transporting the marijuana on this one occasion. The district court rejected Zapata's request for a reduction, in part because it found no evidence or testimony on which to assess what role Zapata played. On advice of counsel, Zapata had refused to discuss her role in the offense during her pre-sentence interview and had refused allocution on the issue before the court, fearing that her statements could be later used against her in the event of a retrial. The district court then denied Zapata's request for a minor-role reduction and sentenced her to 30 months in prison.
 
 
 24
 On January 10, 1995, Zapata timely filed a notice of appeal.
 
 ANALYSIS
 
 25
 In Griffin v. California, 380 U.S. 609 (1965), the Supreme Court held that the Fifth Amendment forbids the prosecution from comment on an accused's silence or failure to testify. Id. at 615. Even if the prosecution comments on a defendant's failure to testify, reversal is required only if: (1) the commentary is extensive; (2) an inference of guilt from silence is stressed to the jury as a basis for the conviction; and (3) there is evidence that could have supported acquittal. Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir.1993), cert. denied, 114 S.Ct. 1294 (1994).
 
 
 26
 In the instant case, no reversal is required. First, the comment was not extensive. Although the prosecution argued in rebuttal that the "[i]t's the defendant," who could "tell us" whether she knew drugs were in the car, the comment was made somewhat obliquely:
 
 
 27
 Now, there was an argument made that no can tell you that the defendant put that drug in the car or knew about it. Yes, somebody can tell us. It's the defendant.
 
 
 28
 We find a closer issue presented by the second factor, concerning whether the prosecution stressed an inference of guilt from Zapata's failure to testify. The prosecutor argued immediately following the above comment:
 
 
 29
 The circumstantial evidence shows you. The direct evidence shows you. It's like the cat in the box. She's the cat.
 
 
 30
 The cat-in-the-box metaphor, as mentioned above, refers to the prosecution's earlier explanation of circumstantial evidence to the jury. However insightful an example of circumstantial evidence it may be, the prosecutor's metaphor insinuates that a silent defendant is as culpable as the cat who ate the mouse. We find such insinuation inappropriate for a prosecutor to make against a nontestifying defendant.
 
 
 31
 The third factor militates against reversal, however, because there was little, if any evidence introduced to support an acquittal. Zapata presented no evidence at trial, while the government established that 84 pounds of drugs had been hidden inside the stolen car that Zapata was driving into the United States. The government also introduced testimony by the border agents, who stated that Zapata acted nervously and gave falsehoods during questioning.
 
 
 32
 As far as the propriety of Zapata's sentence, the district court's finding that Zapata did not qualify as a minor participant was not clearly erroneous. See United States v. Davis, 36 F.3d 1424, 1436 (9th Cir.1994), cert. denied, 115 S.Ct. 1147 (1995). Contrary to Zapata's characterization, the district court did not state that it lacked the authority to find that Zapata was a minor participant without her testimony. The district court simply stated that there was no indication or basis for so finding. Given that Zapata introduced no evidence at trial, and that the defendant bears the burden of proving her minor status at the sentencing hearing, the district court's finding regarding Zapata's minor status was not clearly erroneous.
 
 
 33
 Accordingly, we AFFIRM.
 
 
 
 *
 The Honorable Philip M. Pro, United States District Judge, District of Nevada, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Cir.R. 36-3